**Kai Wu CHAN, Yong Sun Li, Fu Xin Li, Ren Ping Zheng, and Liang Wen Pan, Plaintiffs,**

v.

**Janet RENO, United States Attorney General, Defendant.**

No. 95 Civ. 2586.

United States District Court, S.D. New York.

Feb. 13, 1996.

cases.

Theodore N. Cox, New York City, for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York (F. James Loprest, Jr., Special Assistant US Attorney, of counsel), New York City, for Defendant.

SWEET, District Judge.

Defendant Janet Reno, United States Attorney General (the "Government"), has moved to dismiss the Amended Complaint of Plaintiffs Kai Wu Chan, Yong Sun Li, Fu Xin Li, Ren Ping Zheng, and Liang Wen Pan (collectively, "Plaintiffs"), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the grounds that it is not ripe for review by reason of Plaintiffs' failure to exhaust administrative remedies and that this Court lacks subject matter jurisdiction. The Government has moved in the alternative to dismiss, pursuant to Rule 12(b)(6), Fed. R.Civ.P., on the grounds that Plaintiffs have failed to state a claim upon which relief can be granted.

Plaintiffs have moved, pursuant to Rule 15(a), Fed.R.Civ.P., for leave to amend the Amended Complaint, and pursuant to Rule 56(c), Fed.R.Civ.P., for summary judgment.

For the reasons set forth below, the Government's motion to dismiss for lack of jurisdiction will be granted, Plaintiffs' motion for

summary judgment will be denied as moot, and Plaintiffs' motion to amend will be denied.

### Prior Proceedings

Kai Wu Chan filed his Initial Complaint on April 14, 1995, seeking a declaratory judgment reversing the denial of his application for adjustment of his immigration status and a mandatory injunction that the I.N.S. adjust his status to that of lawful permanent resident ("LPR") under the Chinese Student Protection Act of October 9, 1992, Pub.L. No. 102–404, 106 Stat. 1969–1971 (1992) (the "CSPA"), *see* 8 U.S.C. § 1255. Kai Wu Chan amended that Initial Complaint as of right on May 31, 1995 (the "First Amended Complaint"), adding Yong Sun Li, Fu Xin Li, Ren Ping Zheng, and Liang Wen Pan as plaintiffs. The Government answered on July 24, 1995.

On August 23, 1995, Plaintiffs served the Government with a proposed "Second Amended Complaint" dated May 25, 1995, naming eight additional plaintiffs.

On September 20, 1995, the Government filed its notice of motion to dismiss the First Amended Complaint, accompanied by a memorandum of law. On September 29, 1995, Plaintiffs filed a memorandum of law in support of a motion for summary judgment and in opposition to the Government's motion to dismiss. On October 13, 1995, the day of oral argument, Plaintiffs filed their motions for summary judgment on the First Amended Complaint and to amend that complaint.

On the invitation of the Court, the parties supplemented the record with further submissions after argument. On November 13, 1995, the Government submitted its reply memorandum in support of its motion to dismiss the First Amended Complaint and in opposition to Plaintiffs' motions. That reply memorandum addressed its arguments regarding the motion to dismiss and for summary judgment to the substance of the First Amended Complaint. On November 22, 1995, Plaintiffs submitted their reply memorandum "for summary judgment and in opposition to the motion to dismiss the complaint". This memorandum addressed itself largely to the substance of the Proposed Fourth Amended Complaint, in addition to the substance of the First Amended Complaint.

Plaintiffs' Rule 3(g) statement was submitted on December 18, 1995, and filing was granted *nunc pro tunc*. Further letter submissions were accepted from the parties through January 30, 1996.

### Parties

Plaintiffs are nationals of the People's Republic of China ("China" or the "PRC") residing in the United States. All entered the United States without inspection on or before April 11, 1990.

Janet Reno is the Attorney General and head of the Department of Justice of the United States.

### Facts and Relevant Legislation

The facts set forth here do not constitute findings of fact by the Court. They are drawn from the allegations made by Plaintiffs in the First Amended Complaint.

### I. The Statutory Framework of Immigration Status Adjustment

Section 245 of the I.N.A., 8 U.S.C. § 1255, allows an alien to apply for status as a lawful permanent resident in the United States rather than requiring him to return to his own country to apply for such status. This is known as "adjustment of immigration status" or "status adjustment". Section 245 provides in pertinent part:

> The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

INA § 245, 8 U.S.C. § 1255(a). Because of the special benefit it confers upon an alien who would otherwise be required to depart from the United States to apply for an immi-

grant visa and then return, Section 245 adjustment is considered to be "extraordinary relief." *Howell v. I.N.S.*, 72 F.3d 288, 290 (2d Cir. Dec. 20, 1995) (quoting *Jain v. I.N.S.*, 612 F.2d 683, 687 (2d Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980)); *see also Randall v. Meese*, 854 F.2d 472, 474 (D.C.Cir.1988) (Ruth Bader Ginsburg, J.) (quoting *Jain*, 612 F.2d at 687), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3186, 105 L.Ed.2d 694 (1989); *Rahman v. McElroy*, 884 F.Supp. 782, 785 (S.D.N.Y. 1995).

Section 245(a) requires explicitly that an alien must have been inspected, admitted, or paroled into the United States at the alien's last entry in order to receive status adjustment. "Parole" is, in essence, advance authorization for entry, which may be applied for by an alien before leaving the United States in anticipation of a return voyage to this country. By virtue of Section 245(a), those who enter this country illegally are not generally eligible for status adjustment.

## II. *The Tiananmen Square Massacre and Executive Order 12711*

In the spring of 1989, over one million peaceful protestors gathered in Beijing's Tiananmen Square calling for democracy in China and protesting rampant corruption. On June 4, 1989, harsh military repression crushed the democracy movement. The attention of the United States and its President and Congress was focussed on the plight of Chinese nationals in the United States who were, or could eventually become, deportable. Among them were students; non-students in temporary, lawful status; and those who had come to the United States without lawful status. Some Chinese nationals had come to the United States fearing persecution based on China's coercive family-planning policy.

The President of the United States is expressly authorized to increase refugee admissions, INA § 207, 8 U.S.C. § 1157, or to suspend the "entry of any aliens or of any class of aliens . . . ." INA § 212(f), 8 U.S.C. § 1182(f). In response to a foreign crisis, the President can authorize the entry of particular groups or extend temporary protection to members of such groups who may

already be in the United States, even in the absence of eligibility according to family-based immigration categories.

On April 11, 1990, President Bush issued Executive Order 12711 ("E.O. 12711" or the "Executive Order"), entitled "Policy Implementation With Respect to Nationals of the People's Republic of China." Executive Order 12711, 55 Fed.Reg. 13897–88 (1990), *reprinted in* 1992 U.S.C.C.A.N. 1356. The Executive Order provided expansive protection for Chinese nationals. All Chinese nationals in the United States at the time—whether of lawful or unlawful status—were included in the Executive Order, in its Section 1. *See* 1992 U.S.C.C.A.N. at 1356–57. For Chinese nationals who had entered the United States without authorization, the effect of the Executive Order was to stay deportation proceedings against them until January 1, 1994. They thus were placed in a position known as Deferred Enforcement of Departure ("DED"). Plaintiffs were among those who applied for and benefitted from receiving DED under the Executive Order.

## III. *The Chinese Student Protection Act*

The Chinese Student Protection Act was passed in September 1992, and signed into law the following month. *See* 1992 U.S.C.C.A.N. 1355–61. The CSPA amended INA Section 245—the statute governing status adjustment for aliens in general—by providing an avenue for adjustment to at least some of those persons whose enforced departure from the United States had been deferred as a result of Executive Order 12/11. *See* 55 Fed.Reg. 13,897 (Apr. 11, 1990). The CSPA took effect on July 1, 1993, and provided for an application period of one year for the filing of adjustment applications. CSPA § 2(e); 106 Stat. 1971.

Section 2(a) of the CSPA conferred significant advantages upon qualified PRC nationals in the United States seeking adjustment to LPR status. For example, Section 2(a) exempted qualifying Chinese nationals from the requirements of Section 245(c) of the I.N.A., which generally makes adjustment unavailable to aliens whose legal status has lapsed at the time of application. CSPA

§ 2(a)(5). In addition, Section 2(a) permitted the Attorney General to bypass national quotas, *id.* at § 2(a)(4), and the requirement that an alien have an immigrant visa number, *id.* at § 2(a)(3).

Section 2(a) accorded these benefits to aliens described in CSPA § 2(b). Section 2(b) required that the applicant 1) be a Chinese national described in Executive Order 12711 (that is, have been present in the United States at some time between June 5, 1989, and April 11, 1990, the date of the Order); 2) have resided continuously in the United States since April 11, 1990; and 3) not have been physically present in China for more than ninety days between April 11, 1990, and October 9, 1992, the date of enactment of the CSPA.

At the time of implementation of the CSPA, the I.N.S. issued "interim guidelines" for its application, including 8 C.F.R. § 245.9. Regulation 245.9 interpreted the CSPA not to waive the requirement of inspection and admission or parole—the requirement generally required of any alien seeking status adjustment pursuant to Section 245(a) for CSPA applicants.

On January 1, 1994, protection under the Executive Order expired, and those Chinese nationals who had otherwise been subject to deportation lost the benefits they had gained while privileged as DED. On June 30, 1994, the period to apply for status adjustment under the CSPA expired. At that time, no further applications for status adjustment were possible.

### IV. *Advance Parole and Its Effect*

When the I.N.S. announced Regulation 245.9 as part of its interim guidelines—interpreting the CSPA to allow status adjustment under the CSPA only to those who had been inspected or paroled pursuant to Section 245(a)—many Chinese nationals who had illegally entered the United States and had DED status pursuant to the Executive Order applied for advance parole. In so doing, these Section 1 nationals could avail themselves of status adjustment under the CSPA by leaving the country without eligibility for status adjustment and returning as eligible applicants by virtue of their advance parole.

For the first month-and-a-half of the application period for status adjustment under the CSPA, beginning July 1, 1993, the I.N.S.—pursuant to a directive to its field offices known as Cable 1—continued to grant liberally advance parole to Section 1 nationals, even those without legal status. On August 16, 1993, approximately a month-and-a-half after the CSPA and the interim guidelines had taken effect, the I.N.S. issued a directive to its field offices known as Cable 5, imposing far more stringent requirements on eligibility for advance parole for DED Chinese nationals. As a result, those Section 1 nationals who had applied for advance parole during the month-and-a-half-long period during which advance parole had been relatively easy to obtain became eligible for status adjustment under the CSPA, while those who had delayed in applying for advance parole until the Government restricted its availability were, in effect, without an avenue to become eligible for status adjustment.

### V. *Section 245(i)*

On August 26, 1994, what became Section 245(i) of the I.N.A. was enacted. *See* 8 U.S.C. § 1255(i). Section 245(i) permits aliens who entered the United States without inspection ("E.W.I.'s") to adjust their statuses to those of lawful permanent resident if they are eligible for immigrant classification and have an immigrant visa number immediately available. *Id.* The statute provides for effective dates from October 1, 1994, through October 1, 1997.

The implementing regulation, 8 C.F.R. § 245.10, provides that the provisions of Section 245(i) shall not be retroactive. Thus, Section 245(i) is not applied to applications for status adjustment filed before October 1, 1994, nor to motions to reopen or reconsider any applications filed before that date. Since the last date to apply for status adjustment under the CSPA was June 30, 1994, Regulation 245.10 bars resort to Section 245(i) for CSPA applicants who entered without inspection.

### VI. *Plaintiffs' Applications*

Plaintiffs, all of whom entered the United States without inspection, applied for and

were granted DED benefits under Executive Order 12711 and enjoyed its protection and benefits throughout its duration, until January 1, 1994. Among the temporary benefits and benefits they enjoyed were work authorization and eased restrictions on international travel to and from the United States.

Each of the Plaintiffs applied for adjustment of status in the manner prescribed by the CSPA at some time on or before June 30, 1994. All but one were denied adjustment on the ground that they had not been inspected and admitted or paroled—that is, that they had not legally entered the United States at the time of their most recent entries.[1]

Kai Wu Chan subsequently applied for and was granted advance parole, so that he could visit his critically ill mother in China. He entered the PRC on August 28, 1994, and reentered the United States on or about October 19, 1994. Fu Xin Li and Ren Ping Zheng applied for but were denied advance parole. The First Amended Complaint does not allege that Liang Wen Pan ever applied for advance parole.

Kai Wu Chan filed a motion to reopen and reconsider his application for status adjustment on October 22, 1994, basing his application on his legal entry on October 19, 1994. That motion was denied on February 13, 1995, on the grounds that at the time of the application, he was ineligible for adjustment. On November 28, 1994, Liang Wen Pan filed a motion to reopen. The application was denied on the ground that he had not been admitted, inspected, or paroled.

**Issues Presented in the First Amended Complaint**

In the First Amended Complaint, Plaintiffs seek two declaratory judgments: first, that the I.N.S. unlawfully abused its discretion by denying their applications for status adjustment and their motions to reconsider the initial denial;[2] second, that Regulation 245.9 and Cable 5 are unlawful. In addition, Plaintiffs seek a negative injunction enjoining the

I.N.S. from applying Regulation 245.9 and a mandatory injunction ordering that the grant of Plaintiffs' status adjustment applications.

Plaintiffs advance two arguments to support their assertion that the Government improperly denied them status adjustment. They contend that Section 245(a)—the requirement that only those who entered the United States with inspection and admission or advance parole are eligible for status adjustment—was not meant to apply to Chinese nationals otherwise eligible for adjustment under the CSPA, because the CSPA was meant to accord the same privileges and cover the same people as E.O. 12711. In the alternative, Plaintiffs argue that Cable 5—the directive that constricted the availability of advance parole to Chinese nationals and thus made many unable to meet the terms of Section 245(a)—violated the Executive Order. These two arguments are addressed fully below, but they will be summarized here.

**I. Plaintiffs' Argument that the CSPA Meant to Include All Those Covered by the Executive Order**

Plaintiffs invoke principles of statutory construction and excerpts from the legislative history of the CSPA to support their contention that the Act was not meant to impose a requirement of inspection and admission or parole on Chinese nationals covered by the Executive Order. First, they assert that the CSPA incorporates by reference the definition of "Chinese National" contained in Section 1 of the Executive Order. They note that the Executive Order anticipated a successor statute, as indicated by its expiration date of January 1, 1994, and that the CSPA refers explicitly to "national[s] of the People's Republic of China described in section 1 of Executive Order No. 12711...." CSPA § 2(b)(1).

Second, Plaintiffs point to the text and legislative history of the CSPA. They argue that the words "under section 245" in the general clause of CSPA Section 2 do not

---

**1.** Yong Sun Li was notified that his case had been transferred to the INS Newark Asylum Office, perhaps in error. His application remains pending.

**2.** Because Yong Sun Li's application has not yet been processed, he seeks a declaratory judgment that he is eligible for status adjustment under the CSPA.

**1296**

imply by negative inference that INA § 245(a) applies. They contend further that the legislative history indicates that the removal of barriers to adjustment set out in INA § 245(c) was added in conference purposely to expand the scope of eligibility. Moreover, argue Plaintiffs, the legislative history also acknowledges the close kinship between the Executive Order and the CSPA.

As a final argument in support of their claim that the CSPA did not mean to require inspection and admission or parole, Plaintiffs address traditional canons of interpretation. They contend that the canons require that doubt as to the correct construction of a statute should be resolved in favor of an alien.

## II. *Plaintiffs' Argument that Cable 5 Violates the Executive Order*

As a second argument in support of their claim for relief, Plaintiffs argue that Cable 5—the I.N.S. directive constricting the availability of advance parole to Chinese nationals, reversing earlier policy—violated the Executive Order, which had the force of law.

## Discussion

### I. *Standard of Review*

■ The exclusion and admission of aliens are fundamental acts of sovereignty, and authority over these areas is vested exclusively in the legislative and executive branches of government. *See, e.g., Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982) ("control over matters of immigration is a sovereign prerogative"); *United States v. Valenzuela–Bernal,* 458 U.S. 858, 864, 102 S.Ct. 3440, 3444, 73 L.Ed.2d 1193 (1982) ("[t]he power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches); *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) ("that the formulation of [immigration] policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government"); *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909) ("over no conceivable subject is the legislative power of Congress more complete" than the processing of aliens).

■ Accordingly, the Supreme Court has repeatedly instructed that judicial review in immigration matters is narrowly circumscribed. *See, e.g., Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993); *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972); *Rahman,* 884 F.Supp. at 785 (S.D.N.Y.1995). As the Supreme Court has observed, "Enforcing the immigration laws, and the conditions for residency in this country, is becoming more difficult.... Moreover, the I.N.S. is the agency primarily charged by Congress to implement the public policy underlying these laws.... Appropriate deference must be accorded its decisions." *I.N.S. v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 284, 74 L.Ed.2d 12 (1982) (citations omitted); *see also Zhang v. Slattery,* 55 F.3d 732, 748 (2d Cir.1995) ("it is not the role of the federal courts to administer the executive branch" in immigration matters); *Dhine v. Slattery,* 3 F.3d 613, 619 (2d Cir.1993) ("The Supreme Court has cautioned against 'improvidently encroach[ing] on the authority which the ... Act confers upon the Attorney General and his delegates'" (citations omitted)).

■ Because Congress has charged the Attorney General with the responsibility for interpreting and implementing the immigration laws, such as the CSPA and INA § 245, at issue in this case, *see* 8 U.S.C. § 1103(a); *Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 171–74, 113 S.Ct. 2549, 2559–60, 125 L.Ed.2d 128 (1993), her interpretation of those laws is entitled to this Court's deference. *See, e.g., Zhang,* 55 F.3d at 749. Where reasonable, the Attorney General's interpretation must be sustained, even if a court finds that the interpretation is not "the only reasonable one" or where "had the question arisen in the first instance in judicial proceedings," the court would have reached a different result. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Japan Whaling Ass'n. v. American Cetacean Soc'y,* 478 U.S. 221, 233, 106 S.Ct.

2860, 2867, 92 L.Ed.2d 166 (1986); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (where the statute is unclear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute"); *Isaacs v. Bowen,* 865 F.2d 468, 472 (2d Cir. 1989); *Weeks v. Quinlan,* 838 F.2d 41, 43 (2d Cir.1988).

## II. *The Issues Presented in the First Amended Complaint Are Not Justiciable*

■ Plaintiffs assert jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 704, which provides that "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review," and 28 U.S.C. § 1331, which provides district courts with original jurisdiction over federal questions. The I.N.A., the CSPA, and the regulations promulgated under them, paired with the doctrine of exhaustion of administrative remedies, render Plaintiffs' claims unripe for review and deprive the Court of subject matter jurisdiction. The First Amended Complaint is, therefore, nonjusticiable, and it will be dismissed.

This matter is not one of settled law. "[T]he Supreme Court has not yet grappled with the question whether, outside the context of a deportation proceeding or order, district director status adjustment or asylum application denials are amenable to court review." *Randall,* 854 F.2d at 482 n. 16. Our Court of Appeals recently declined to pass on the question of whether a district court possesses subject matter jurisdiction to review a denial of adjustment of status before the applicant is subject to deportation proceedings. *Howell,* 72 F.3d at 293 n. 5.

This is not to say that some district courts, and some courts of appeals in other circuits, have not addressed this and similar questions. The courts that have been asked to determine if a district court has jurisdiction to review a district director's denial of adjustment of status have differed in their conclusions. Some have held there to be jurisdiction. *See, e.g., Jaa v. United States I.N.S.,* 779 F.2d 569 (9th Cir.1986); *Reid v.*

*I.N.S.,* No. 91 Civ. 6535, 1993 WL 267278 (S.D.N.Y. Nov. 7, 1993). Yet, as our Court of Appeals has noted, those cases' applicability here is limited by their reliance on the Supreme Court's decision in *Cheng Fan Kwok v. I.N.S.,* 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968). *Howell,* 72 F.3d at 290. *Cheng Fan Kwok* did not address directly whether district courts have jurisdiction to review a district director's denial of an application for adjustment of status; rather, it held that judicial review is available at the district court level, before the court of appeals level, when a district director denies a stay of deportation. *Howell,* 72 F.3d at 290 (citing *Cheng Fan Kwok* at 210, 88 S.Ct. at 1973); *see Randall,* 854 F.2d at 482 n. 16.

Other courts have held district courts to lack jurisdiction over district directors' denials of Section 245 status adjustments. They have generally done so, however, where deportation proceedings have already commenced. *See id.* at 472. In one case from the Seventh Circuit, the court did hold that a district court properly declined to exercise jurisdiction because the claim was not ripe for judicial review, even though deportation proceedings had not yet commenced. *Massignani v. I.N.S.,* 438 F.2d 1276 (7th Cir. 1971). These courts have held that because the alien challenging the adjustment denial has opportunity for *de novo* administrative consideration—and subsequent appellate review—a direct challenge to an adjustment denial constitutes a failure to exhaust administrative remedies, making the claim unripe for review. *See Rahman v. McElroy,* 884 F.Supp. 782, 785 (S.D.N.Y.1995) (dismissing complaint of aliens simultaneously seeking adjustment and immigrant visas where the adjustment applications had not yet been adjudicated, and holding that "[f]ailure to seek ... administrative review before challenging an adjustment denial in a district court constitutes a failure to exhaust administrative remedies"); *Yeung v. Reno,* 868 F.Supp. 53, 57 (S.D.N.Y.1994), *aff'd.,* 57 F.3d 1062 (2d Cir.1995) ("This court has concluded that its direct review of an adjustment determination is precluded by the requirement of exhaustion of remedies." (citations omitted)); *Augoustinakis v. United States I.N.S.,* 693

F.Supp. 1554, 1556 (S.D.N.Y.1988) (holding that, because deportation proceedings may produce a different outcome, any "decision [by this Court] regarding the appropriateness of the District Director's refusal to exercise his discretion to adjust the plaintiff's status would constitute an advisory opinion," which is prohibited (citations omitted)).

As a general rule, subject matter jurisdiction in cases "arising under" the I.N.A. is granted by statute. 8 U.S.C. § 1329 provides, "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of Subchapter II of the I.N.A. That subchapter includes the section governing adjustment of status." 8 U.S.C. § 1255; *see Augoustinakis*, 693 F.Supp. at 1555.

The doctrine of exhaustion of administrative remedies, however, circumscribes the jurisdiction granted by these provisions and the Administrative Procedure Act. That doctrine was described by our Court of Appeals in *Howell*:

> "a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself." *Guitard v. United States Secretary of Navy*, 967 F.2d 737, 740 (2d Cir.1992) (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 [58 S.Ct. 459, 463–64, 82 L.Ed. 638] (1938)). The requirement of exhaustion "may arise from explicit statutory language or from an administrative scheme providing for agency relief." *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 592 (2d Cir. 1993). If a party fails to exhaust administrative remedies, then the court may dismiss the action because subject matter jurisdiction does not exist. *DiLaura v. Power Auth.*, 982 F.2d 73, 79 (2d Cir.1992).

*Howell*, 72 F.3d at 291.

*Howell* explored the consequences of this doctrine where an application for adjustment of status is denied. The court upheld a district court's ruling that it lacked jurisdiction to review the I.N.S.'s denial of an alien's application to adjust immigration status to that of a lawful, permanent United States resident, pursuant to section 245(a). There,

unlike here, the I.N.S. had commenced deportation proceedings against an alien. Under those circumstances, held the *Howell* court, the alien "has the opportunity, pursuant to the regulations, to renew her application for adjustment of status before an immigration judge," and must therefore exhaust administrative remedies before seeking judicial review. *See Howell*, 72 F.3d at 293.

As in *Howell*, here both statutory language and an administrative scheme invoke the doctrine of administrative exhaustion. The regulations promulgated under the I.N.A. create several levels of review. First, they provide that if an application is denied initially by the I.N.A. district director, "[n]o appeal lies from the denial of an application by the director, but the applicant retains the right to renew his or her application in [deportation proceedings]." 8 C.F.R. § 245.2(a)(5)(ii); *see Howell*, 72 F.3d at 291–92; *Jain*, 612 F.2d at 689–90; *Randall*, 854 F.2d at 474 ("the regulations preclude a direct administrative appeal" from denial of a status adjustment application).

Deportation proceedings do not commence automatically upon denial of an application for adjustment of status; instead, they are "commenced by the filing of an order to show cause with the Office of the Immigration Judge." 8 C.F.R. § 242.1(a); *see Howell*, 72 F.3d at 291. However, once an alien is identified for deportation, he has three more levels of review available. First, he "[m]ay apply to the immigration judge for ... adjustment of status under section 245...." 8 C.F.R. § 242.17(a). At this initial stage of proceedings to determine deportability, "the alien is entitled to a *de novo* review of his application...." *Jain*, 612 F.2d at 689–90; *see Randall*, 854 F.2d at 474. Indeed, "[a]t this stage, the alien is accorded a plenary hearing [at which] he has the right to be represented by counsel, to introduce evidence, and to cross-examine...." *Id.* (citing 8 C.F.R. §§ 242.17(a), 245.2(a)(5)(ii)).

If the immigration judge denies the alien's application for adjustment during deportation proceedings, two levels of appeal remain. The first avenue is to the Board of Immigration Appeals (the "B.I.A."). 8 C.F.R.

§§ 3.1(b)(2), 242.21. Finally, by prescription of the I.N.A. itself, a final appeal can then made to a circuit court of appeals. 8 U.S.C. § 1105a(a); *see Randall,* 854 F.2d at 475. There, "the petition shall be determined solely upon the administrative record upon which the deportation order is based[,] and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive." 8 U.S.C. § 1105a(a)(4).

In essence, then, an alien seeking adjustment of status has a right to four reviews, two of which are *de novo*—one in the course of the initial application, the other in the course of deportation—and two of which are appellate reviews of the second *de novo* proceeding. Plaintiffs, because they have not been subjected to deportation proceedings, have not yet exhausted their administrative remedies, and if the doctrine of exhaustion of administrative remedies applies, this Court lacks subject matter jurisdiction.

There are, however, as noted by the *Howell* court, "established exceptions to the exhaustion rule." Specifically:

Exhaustion of administrative remedies may not be required when: (1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.

*Howell,* 72 F.3d at 291–92 (quoting *Guitard,* 967 F.2d at 741 (internal quotations omitted)). None of these exceptions applies to the First Amended Complaint.

First, the remedies available to Plaintiffs provide a genuine opportunity for adequate relief. In *Jain,* 612 F.2d 683, an alien denied section 245 adjustment of status by a district director argued to our Court of Appeals (on appeal from a decision of the B.I.A.) that he had been denied due process because he was unable to appeal the original denial of that application prior to deportation proceedings. *Id.* at 689. The Court of Appeals found the argument to lack merit, because:

the alien is entitled to a *de novo* review of his application in the context of deportation proceedings. [8 C.F.R. § 245.2(a)(4).] We consider this dual opportunity to present a section 245 application to provide ample process, particularly in light of the discretionary nature of section 245 relief. The fact that the second consideration of the application takes place within the context of a deportation proceeding is irrelevant.

612 F.2d at 690; *see also Howell,* 72 F.3d at 293.

Second, as in *Howell,* "requiring [Plaintiffs] to renew their application for adjustment of status before an immigration judge at the deportation proceedings rather than allowing immediate review in district court will not cause irreparable injury to [them]." *Howell,* 72 F.3d at 293. *Howell* held so where deportation proceedings had already begun, and it could be argued that by compelling Plaintiffs to wait until deportation proceedings have begun, they will injured. It is true that, pending deportation proceedings, Plaintiffs will be left in limbo. However, that injury is by no means "irreparable"; to the contrary, the *de novo* review in the context of deportation plus the two levels of appeal provide for the repair of any injury suffered by Plaintiffs. As our Court of Appeals noted in *Small v. Kiley,* 567 F.2d 163, "Irreparable harm cannot be established by a mere reliance on the burden of submitting to agency hearings." *Id.* at 165 (citing *Sears, Roebuck & Co. v. NLRB,* 473 F.2d 91, 93 (D.C.Cir.1972), *cert. denied,* 415 U.S. 950, 94 S.Ct. 1474, 39 L.Ed.2d 566 (1974) (preliminary injunction sought to enjoin administrative process pending determination of deportability)).

Third, the administrative appeal will not be futile, since, as in *Howell,* "if the immigration judge approves [Plaintiffs'] application for adjustment of status at the deportation proceedings [they] will have had an adequate remedy." *Howell,* 72 F.3d at 293.

Fourth, the First Amended Complaint does not set forth "substantial constitutional questions"; rather, it merely poses issues of agency interpretation and statutory construction. The declaratory judgments it seeks

require (in contrast to the proposed "Fourth Amended Complaint", discussed below) only an analysis of whether the I.N.S. properly construed the I.N.A., the CSPA, and the Executive Order in promulgating its regulations and directives and in denying Plaintiffs' the relief sought. As such, "substantial constitutional questions" are not raised.

In sum, none of the exceptions to the doctrine of administrative exhaustion are met by the First Amended Complaint. It is not, therefore, ripe for review, nor does this Court possess subject matter jurisdiction.

Finally, it should be noted, as then-Judge Ginsburg noted in *Randall,* that:

> To treat the question cogently, one must face a historical obstacle. To this day, "decisions of United States consuls on visa matters are nonreviewable by the courts." A district director's status adjustment decision, it has been observed, "simply provides a replacement for traveling overseas to obtain an immigrant visa in the classic fashion, from a consular officer."

*Randall,* 854 F.2d at 482 n. 16 (citations omitted). This peculiar anomaly reinforces the conclusion that the district courts have no jurisdiction over matters involving adjustment of status, even before deportation proceedings have commenced.

Because the First Amended Complaint does not present a claim ripe for review over which this Court possesses jurisdiction, it will be dismissed, in grant of the Government's motion. Plaintiffs' motion for summary judgment on the First Amended Complaint will, therefore, be denied as moot.

## III. *Plaintiffs' Motion to Amend Will Be Denied*

Plaintiffs have moved to amend their complaint for a second time. Although this latest complaint is styled the "Fourth Amended Complaint", it is only the second amended complaint that has been brought before the Court. Because the Proposed Fourth Amended Complaint non-justiciable—like the First Amended Complaint—and therefore futile, the motion to amend will be denied.

### A. *The Substance of the Fourth Amended Complaint*

In the Proposed Fourth Amended Complaint, Plaintiffs seek to add twenty-six new plaintiffs to the action (the "Proposed Plaintiffs"), to assert several new legal theories in support of the relief sought in the First Amended Complaint, and to receive additional relief. Proposed Plaintiffs fall into several categories. Although the Proposed Fourth Amended Complaint does not differentiate the relief requested by each defendant, only certain relief would be pertinent to each group, depending on the posture in which its members approach the Court.

### 1. *The Xiu Ji Chen Parties: Those Who Did Not Apply for Advance Parole or Move to Reopen Their Denials of Status Adjustment*

Proposed Plaintiffs Xiu Ji Chen, Zi Xiong Zhang, Zhou Qiang Dong, Fu Jie Pan, Chang Ming You, Jian Chun Pan [3], Jian Tai Zhang, Jun Nang Pan, Yu Guan Zhang, Ren Xiang Zheng, and Xiao Shu Zheng (the "Xiu Ji Chen Parties") applied for and received DED privileges under the Executive Order. All then applied for and were denied status adjustment under the CSPA on the ground that they had not been admitted, inspected, or paroled at the time of their most recent entries—that is, that they did not meet the requirements of Section 245(a).[4] The Proposed Fourth Amended Complaint would seek declaratory relief similar to that requested in the First Amended Complaint: first, that the I.N.S. abused its discretion in failing to waive the requirements of Section 245(a) for those covered by the CSPA; second, that the CSPA must be construed to waive those requirements. Also as in the case of the First Amended Complaint, two injunctions would be sought by the Proposed

---

**3.** Also referred to as Chun Jian Pan. *See* Proposed Fourth Am.Compl. ¶ 20.

**4.** Plaintiff Yong Sun Li approaches the Court in a similar but somewhat different posture. As noted above, his application was transferred to the INS Newark Asylum Office, perhaps in error, and the INS has not yet disposed of his application. He seeks a declaratory judgment that he is eligible for status adjustment under the CSPA on the same theory as these proposed plaintiffs.

Fourth Amended Complaint: first, to require the I.N.S. to interpret the CSPA to waive the requirement of inspection and admission or parole; and second, to grant Plaintiffs' applications. As in the case of the First Amended Complaint, the Proposed Fourth Amended Complaint would support these claims with arguments based chiefly on statutory interpretation and legislative intent.

Unlike the First Amended Complaint, however, the Proposed Fourth Amended Complaint would add a constitutional argument in support of the petition for this relief. Because they did not apply for, and thus did not receive, advance parole, the Xiu Ji Chen Parties were ineligible for status adjustment under the CSPA and I.N.A., in contrast to similarly situated E.W.I. Chinese nationals who applied for and received advance parole, left the country, and returned. The Proposed Fourth Amended Complaint argues that because there is no rational basis to distinguish E.W.I. Chinese nationals who traveled from and reentered the United States from those who did not, the Government's interpretation of the CSPA constitutes a violation of the right of equal protection under the law.

### 2. The Fu Xin Li Parties: Those Who Applied For and Were Denied Advance Parole

Like the Xiu Ji Chen Parties, plaintiffs Fu Xin Li and Ren Ping Zheng and proposed plaintiffs Tian Dong Zhang, Jun Ting Zhang, Wei Yang, Hui Lan Chen, Fen Yong Chen, Li Yong Chen, Yong Zhi Chen, Zhen Xiang Chen, Li Yun Dong, Mao Sheng Dong, Yi Lu Dong, Yu Zheng, and Jing Kui You (the "Fu Xin Li Parties") applied for and were grant-

ed protection under Executive Order 12711.[5] Unlike the Xiu Ji Chen Parties, the Fu Xin Li Parties also applied for advance parole after August 16, 1993—that is, after Cable 5 was promulgated by the I.N.S., reversing the liberal policy of granting advance parole to E.W.I. Chinese nationals. All had their applications denied.

In the Proposed Fourth Amended Complaint, in addition to the arguments advanced by the Xiu Ji Chen Parties, these parties would argue that Cable 5 was unlawfully promulgated. They argue that because Cable 5 resulted in an arbitrary distinction between those who had applied for advance parole before its promulgation—while Cable 1's liberal policy was still in effect—and those who applied afterwards, it violated their right to equal protection.

### 3. The Liang Wen Pan Parties: Those Who Did Not Apply for Advance Parole and Whose Motions to Reopen Were Denied on the Ground that Section 245(i) Was Not Retroactive

Like the Xiu Ji Chen Parties, plaintiff Liang Wen Pan and proposed plaintiff Ming Xing Lin (the "Liang Wen Pan Parties") received DED privileges under the Executive Order and were denied adjustment of status on the ground of lack of inspection and admission or parole. Also like the Xiu Ji Chen Parties, there is no suggestion that Liang Wen Pan or Ming Xing Lin applied for advance parole.[6] Unlike the other plaintiffs and proposed plaintiffs, the Liang Wen Pan Parties filed motions to reopen their applications for status adjustment based on INA § 245(i). Section 245(i), it will be recalled,

---

**5.** Proposed plaintiff Wan Nong Lu is included in this category in the Proposed Fourth Amended Complaint, ¶ 20, but is not included in the caption of that document.

**6.** Kai Wu Chan, who filed the initial complaint in this action, stands in a posture unique from the other plaintiffs and proposed plaintiffs. As noted above, Kai Wu Chan applied for and was denied adjustment of status. Subsequently, on August 17, 1994, he was granted advance parole, allowing him to leave and legally reenter the United States, so that he could visit his critically ill mother in China. He entered the PRC on August 28, 1994 and reentered the United States on or about October 19, 1994.

By Motion to Reopen or Reconsider dated October 2, 1994, Kai Wu Chan moved the INS to reopen its decision denying his application under the CSPA, based on his legal entry on October 19, 1994. By letter dated February 13, 1995, the INS denied that motion, stating only that at the time the initial application had been made, Kai Wu Chan had been ineligible for status adjustment.

It would appear, then, that Kai Wu Chan's claim arises primarily from the INS's promulgation of 8 C.F.R. § 245.10. He is, therefore, placed with the Liang Wen Pan Parties, despite the fact that he, unlike they, did apply for and receive advance parole.

was enacted in August 1994 to permit E.W.I.'s to apply for status adjustment as long as they are eligible for immigrant classification and have an immigrant visa number immediately available. 8 U.S.C. § 1255(i). It will also be recalled that the I.N.S. has interpreted Section 245(i), through 8 C.F.R. § 245.10, not to apply retroactively, with the result of depriving E.W.I. Chinese nationals of the ability to use Section 245(i) to have their denials of status adjustment reconsidered in the light of the new legislation.

The Proposed Fourth Amended Complaint would seek to enjoin the I.N.S. to approve the applications of individuals denied status adjustment on motion for reconsideration as a result of Section 245(i). In support of that claim, Plaintiffs would argue, first, that Regulation 245.10, interpreting Section 245(i) not to apply retroactively, violates the principle that a case should be decided on the basis of present law if a change in law occurs during the pendency of a case. Second, Plaintiffs would argue that such an interpretation is patently unreasonable and serves merely as a pretext by the I.N.S. to limit E.W.I. Chinese nationals from adjusting to L.P.R. status.

### 4. The Daoyu Li Parties: Those Whose Motions for Adjustment Were Denied on the Grounds That They Had Spent Over Ninety Days Cumulatively in PR China

Proposed Plaintiffs Daoyu Li and Shao Fa Hao, like the other plaintiffs and proposed plaintiffs, applied for and received DED privileges under the Executive Order. Each applied for adjustment of status and was denied on the ground that he had been in China for a cumulative total of more than ninety days between April 11, 1990, and October 9, 1992, despite the fact that neither of his two trips had alone exceeded ninety days.

Daoyu Li and Shao Fa Hao therefore seek substantially different relief than that sought by the other Plaintiffs and Proposed Plaintiffs. They seek declaratory judgments: [a] declaring the "90 in PR China" exclusion in the CSPA to be an unconstitutional violation of equal protection [b] declaring the "90 in PR China" exclusion to be an unconstitutional violation of due process; [c] if the "90 in PR China" exclusion is found constitutional, then declaring that the regulation 8 C.F.R. § 245.9(b)(4), requiring that time in PR China on different trips must be *added together* to be an abuse of discretion.

Proposed Fourth Am.Compl. ¶ 23 (emphasis in original).

### B. The Standard for Leave to Amend

■ Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." The Supreme Court has, however, interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the amendment is not futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see Mackensworth v. S.S. Am. Merchant,* 28 F.3d 246, 251 (2d Cir.1994); *Prudential Ins. Co. v. BMC Indus., Inc.,* 655 F.Supp. 710, 711 (S.D.N.Y. 1987).

■ An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979); *Freeman v. Marine Midland Bank–New York,* 494 F.2d 1334, 1338 (2d Cir.1974). As will be discussed herein, the Proposed Fourth Amended Complaint, like the First Amended Complaint, presents a non-justiciable claim and fails to present this Court with subject matter jurisdiction. Therefore, because the Proposed Fourth Amended Complaint would be subject to a successful motion to dismiss on Rule 12(b)(1) grounds, amendment would be futile. Therefore, Plaintiffs' motion will be denied.

### C. Amendment Would Be Futile

#### 1. The Daoyu Li Parties Cannot Be Joined With Plaintiffs

■ The Daoyu Li Parties cannot be properly joined with Plaintiffs in this action. Federal Rule of Civil Procedure 20(a) per-

mits joinder of plaintiffs only if they "assert any right to relief jointly, severally or in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences." Unlike those of the other proposed plaintiffs, the claims of the Daoyu Li Parties do not arise out of the same transaction, occurrence, or series of transactions or occurrences as those of Plaintiffs. Indeed, none of the claims of Plaintiffs or Proposed Plaintiffs can be said to have arisen from the same "transaction or occurrence", since each submitted a separate application and the I.N.S. considered each application in a separate transaction and as a separate occurrence. The other plaintiffs and proposed plaintiffs, however, can be said to have alleged claims arising from the same "series of transactions or occurrences", because the I.N.S. disposed of their applications in a series of similar occurrences and transactions based on the same interpretations of the I.N.A., the CSPA, and the Executive Order.

In contrast, Daoyu Li and Shao Fa Hao allege that they were denied adjustment of status because of the Government's interpretation of and imposition of the ninety-day exclusion. They do not allege that the Government's failure to adjust their status resulted from any of the interpretations or actions alleged by the other parties to have underlay their failures to receive adjustment. There is, then, no common series of occurrences or transactions underlying the claims of the Daoyu Li Parties and those of the other plaintiffs and proposed plaintiffs.

Because their claims do not arise from the same transaction, occurrence, or series of transactions or occurrences as Plaintiffs or Proposed Plaintiffs, Daoyu Li and Shao Fa Hao cannot be joined, and any amended complaint must omit their claims.

### 2. The Fourth Amended Complaint is Not Justiciable

The fact that Daoyu Li and Shao Fa Hao cannot be joined is sufficient to deny Plaintiffs' motion to amend. However, because "leave shall be freely given when justice so requires," Rule 15(a), courts generally construe Rule 15(a) liberally, and such defects generally do not of themselves cause such a

motion to be denied. In such an instance, a court "may narrow the scope of the amendment if it considers the request too broad." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1486, at 610 (2d ed. 1990). If the Proposed Fourth Amended Complaint were so narrowed, it would have to be reshaped to omit the claims of Daoyu Li and Shao Fa Hao.

In the absence of those claims, which are based heavily on constitutional arguments, the claims in the Proposed Fourth Amended Complaint, like the First Amended Complaint, are, for the reasons set forth below, not ripe for review, and this Court lacks jurisdiction. Therefore, the Proposed Fourth Amended Complaint could not, if Plaintiffs were granted leave to file it, survive a motion to dismiss. Because it could not survive a motion to dismiss, its filing would be futile. Plaintiffs' motion to amend will, therefore, be denied.

### a. The Fourth Amended Complaint Does Not Meet Any of the First Three Established Exceptions to the Exhaustion Rule

As in the case of the First Amended Complaint, Plaintiffs would bring the Proposed Fourth Amended Complaint without having exhausted their administrative remedies. Here, as there, none the first three established exceptions to the exhaustion rule, which would permit this Court to address the claims, applies. For the same reasons as those discussed with regard to the First Amended Complaint, available remedies do provide genuine opportunities for adequate relief; irreparable injury will not occur without immediate judicial relief; and administrative appeal would not be futile. Therefore, to present a claim ripe for review, the Proposed Fourth Amended Complaint must present a "substantial constitutional question" of the type contemplated by *Guitard, Howell,* and other cases recognizing that exception.

### b. The Fourth Amended Complaint Does Not Meet the Fourth Exception to the Exhaustion Rule

Plaintiffs have raised some "substantial constitutional questions." However, only "in

certain instances" do substantial constitutional questions present exceptions to the exhaustion rule. *See Howell,* 72 F.3d at 293; *Guitard,* 967 F.2d at 741. Two lines of cases demonstrate that the claims asserted in the Proposed Fourth Amended Complaint do not present one of the instances contemplated by the cases and that, therefore, administrative remedies must be exhausted.

### i. *Substantial Constitutional Questions Are Raised in the Fourth Amended Complaint*

Having established that the claims pertinent to the Daoyu Li Parties—those involving the ninety-day exclusion—could not properly be considered part of any newly amended complaint, only the claims relevant to the other three groups of parties need be addressed.

For the most part, the claims and arguments relevant to the Xiu Ji Chen Parties duplicate those set out in the First Amended Complaint. As there, most of these claims and arguments simply involve matters of statutory construction, legislative intent, and administrative interpretation. Therefore, they do not present substantial constitutional claims.

The Fourth Amended Complaint would, with reference to the Liang Wen Pan parties, argue that by refusing to apply Section 245(i) retroactively, the I.N.S.'s interpretation violates the principle that a case should be decided on the basis of present law if a change in law occurs during the pendency of the case. They would argue further that such an interpretation is unreasonable. Neither of these arguments rises to the level of a substantial constitutional question.

The Proposed Fourth Amended Complaint does, however, raise a constitutionally based equal protection argument: that there is no rational basis to distinguish between E.W.I. Chinese nationals who travelled from and reentered the United States from those who did not and that, as a result, the I.N.A.'s requirement of advance parole violates the right to equal protection. Similarly, the Proposed Fourth Amended Complaint would, in addition to this argument, argue that Cable 5 was unlawfully promulgated. Although part of the argument relating to Cable 5 rests on the nonconstitutional argument that the I.N.S. violated the Executive Order in promulgating Cable 5, another part of the argument is based on the Constitution: that by creating an arbitrary distinction between those who had applied for advance parole before its promulgation and those who applied afterwards, the I.N.S. violated equal protection rights.

These substantial constitutional claims raised are not without merit. Cable 5 was created to close a loophole. As the Honorable Patricia M. Wald noted in *Lin v. Meissner,* 70 F.3d 136 (D.C.Cir.1995):

> the INS had indeed granted advanced parole liberally under the Executive Order. However, the agency became less generous when it realized that its advanced parole grants had created a "loophole" with respect to the adjustment of all EWIs (not just PRC nationals under the CSPA) who left the country on advanced parole and who could then claim eligibility for adjustment under § 245(a) upon return. The INS has since attempted to close this loophole, and we do not believe the agency's former practice in any way constituted a binding interpretation of the CSPA.

*Lin,* 70 F.3d at 141 (footnote omitted). Regardless of whether or not Cable 5 properly interpreted the I.N.A., CSPA, and Executive Order, it appears to lack a rational relation to a legitimate government purpose. No basis for the distinction between E.W.I. Chinese nationals who traveled from and reentered the United States with advance parole and those who did not has been offered. Because of the difference in availability of advance parole status under Cables 1 and 5, the eligibility of otherwise similarly situated individuals depended solely on the date they applied for advance parole. Plaintiffs' rights to equal protection therefore may well have been violated by the lack of rational basis for the distinction between these two nearly identical groups. Nothing in E.O. 12711 or the CSPA suggests that this distinction is rationally related to a legitimate government interest.

"[T]he constitutional promise of equal protection of the laws applies to aliens as well as citizens. *Yick Wo v. Hopkins,* 118 U.S. 356,

6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Francis v. Immigration and Naturalization Serv.,* 532 F.2d 268. Minimal scrutiny is applied in such instances, *Francis,* 532 F.2d at 272, requiring that "distinctions between different classes of persons must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.* at 272 (citations omitted).

In *Francis,* as here, the availability of an immigration benefit hinged on whether or not the alien had departed and returned to the United States. Section 212(c) of the I.N.A. on its face allows discretionary relief from exclusion under section 212(a) for aliens returning to "lawful unrelinquished domicile of seven consecutive years." *Id.* The plaintiff, a Jamaican, was excludable under a subsection of Section 212(a) relating to possession of marijuana.

The court found that the underlying purpose of section 212(c) was to provide "some degree of flexibility to permit worthy returning aliens to continue their relationships with family members in the United States despite a ground for exclusion." *Id.* at 272. The Court noted the lack of "any reason why this petitioner's failure to travel abroad following his conviction should be a crucial factor in determining whether he may be permitted to remain in this country." *Id.* at 273. The court thus held the agency interpretation of Section 212(c) to be unconstitutional.

The reasoning of *Francis* appears to apply directly to Plaintiffs' claim that the travel requirement as a condition of the grant of CSPA benefits is constitutionally infirm. Whether or not a particular alien left the United States is wholly unrelated to the purpose of the CSPA. The legislative history makes clear that one purpose of the CSPA is to address the legal limbo of the temporarily protected E.O. 12711 beneficiaries so that they can plan for the future and make long-term plans for their families, considerations underlying the holding in *Francis.* In any case, none of the legislation pertinent here suggests any governmental purpose that could be achieved by favoring those who have left the country for some time. Indeed, quite the opposite would appear to be the case. As the Court of Appeals noted in *Francis,* "[r]eason and fairness would suggest that an alien whose ties with this country are so strong that he has never departed after his initial entry should receive at least as much consideration as an individual who may leave and return from time to time."

Thus, the Government here has presented no legitimate purpose in distinguishing between those Chinese nationals who, often by happenstance, applied before August 16, 1993, received advance parole, and thus qualified under Section 245 from those who applied afterwards and are unable to apply for status adjustment. Equal protection rights may well have been violated, and a substantial constitutional claim would, therefore, be presented by the Proposed Fourth Amended Complaint.

**ii. *The Substantial Constitutional Questions Raised in the Fourth Amended Complaint Are Not of the Type Presenting an Exception to the Administrative Exhaustion Doctrine***

Although Plaintiffs' equal protection claims thus appear to be tenable, they are not within this Court's jurisdiction. An examination of two lines of cases relevant to the fourth exception to the exhaustion rule demonstrates that the substantial constitutional questions in the Proposed Fourth Amended Complaint would raise is of the type contemplated by that exception.

First, the roots of the *Guitard* constitutional question exception involved complaints distinguishable from the Proposed Fourth Amended Complaint. The exception was imported to our Circuit from the Court of Appeals for the Ninth Circuit, via the Fifth Circuit. The former held that "exhaustion may not be required, under some precedents, if the plaintiff has raised a substantial constitutional question." *Downen v. Warner,* 481 F.2d 642, 643 (9th Cir.1973) (*cited in Von Hoffburg v. Alexander,* 615 F.2d 633, 638 (1980) (5th Cir.1980) (*cited in Guitard,* 967 F.2d at 741 (*cited in Howell,* 72 F.3d at 293))). *Downen,* however, applied such an exemption where there was "a claim founded *solely* on a constitutional right." In contrast

to *Downen* and *Guitard,* the Fourth Amended Complaint, involves not only constitutional rights, but also issues of administrative interpretation.

A second line of cases interpreting the impact of constitutional questions has descended from the Supreme Court's holdings in *McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), and *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). *McNary* involved a challenge to the procedural mechanism by which applicants were selected for an amnesty program for special agricultural workers ("SAW"s), pursuant to the Immigration Reform and Control Act of 1986. The I.N.S. determined SAW status eligibility based on evidence presented at a personal interview with each applicant. Appeal from rejections of applications for SAW status was limited—by language specific to the Immigration Reform and Control Act, § 210(e), not that governing status adjustments in this action—to judicial review of a deportation order by the circuit courts of appeals. The Haitian Refugee Center and a class of unsuccessful SAW applicants brought an action in federal district court alleging that the initial application review process was conducted arbitrarily, violating the Immigration Reform and Control Act and their due process rights.

The Supreme Court framed the question to be addressed as "whether § 210(e), which bars judicial review of individual determinations except in deportation proceedings, also forecloses this general challenge to the I.N.S.' unconstitutional practices." *McNary,* 498 U.S. at 491, 111 S.Ct. at 895. The Court held that the district court had federal question jurisdiction to hear the aliens' constitutional and statutory challenges to the I.N.S. procedures.

*McNary* involved the interpretation of a particular statute, and, therefore, its applicability here is limited. Nonetheless, the fact that both the statute there and the I.N.A.'s provisions on administrative appeal set forth specific paths for review and appeal suggests applying the reasoning of *McNary* to the case at bar. That analysis demonstrates that although Plaintiffs have raised equal protec-

tion questions, they are not presented in the context *McNary* suggested merits a departure from the exhaustion rule.

*McNary*'s general thrust was to vest the district courts with jurisdiction only where "the administrative appeals process does not address the kind of procedural and constitutional claims respondents bring." *Id.; see Rahim v. McNary,* 827 F.Supp. 224, 224 (S.D.N.Y.1993), *aff'd.,* 24 F.3d 440 (2d Cir. 1994). Thus, the *McNary* court singled out for district court review only actions addressing themselves solely to practices and procedures, rather than to adjudication of specific claims on their merits. *Id.* at 492, 111 S.Ct. at 896; *see Rahim,* 827 F.Supp. at 228. Put another way, *McNary* required that a district court review only those claims where the relief sought was merely collateral to any claims for relief, not dispositive of the claim on the merits, and thus inappropriate for administrative review alone.

In drawing this distinction, *McNary* contrasted its facts with those in the Court's earlier decision in *Heckler.* In *Heckler,* the respondents had sought to establish a right to reimbursement under the Medicare Act for a particular form of surgery they had undergone (or in one case, needed). Although they had not exhausted all of the statutorily required administrative procedures, the respondents had filed an action in District Court seeking review of Secretary Heckler's policy of refusing reimbursement for that surgery.

The Supreme Court in *Heckler* had held that the district court had properly dismissed the case for lack of subject matter jurisdiction because "the essence of the complaint was a claim of entitlement to payment for the surgical procedure ... since success in their challenge of the Secretary's policy denying reimbursement would have the practical effect of also deciding their claims for benefits on the merits." *Id.* at 494, 111 S.Ct. at 897. Thus, the Supreme Court concluded in *McNary,* the "respondents' judicial action was not 'collateral' to their claims for benefits." *Id.* (citing *Heckler* at 617, 104 S.Ct. at 2023). The *McNary* Court distinguished the facts in front of it from those in *Heckler,* noting first that "the individual respondents

in this action do not seek a substantive declaration that they are entitled to SAW status." *Id.* at 495, 111 S.Ct. at 898.

■ The case at bar resembles *Heckler* more than it does *McNary.* Although the equal protection claims raised in the Proposed Fourth Amended Complaint are addressed to I.N.S. interpretations, they are not clearly collateral. Granting Plaintiffs the relief they seek here will have the effect of adjudicating their cases on the merits as well. Thus, under *McNary,* this is not an instance where departure from the administrative exhaustion doctrine is warranted.

■ As a second reason for finding district court jurisdiction in *McNary,* the Supreme Court held that district court review was appropriate where the claim involved a "pattern and practice" of procedural abuse that could not be proven through the administrative process. The Court stated that:

> [t]o establish the unfairness of the INS practices, respondents in this case adduced a substantial amount of evidence, most of which would have been irrelevant in the processing of a particular individual application. Not only would a court of appeals reviewing an individual SAW determination therefore most likely not have an adequate record as to the pattern of INS' allegedly unconstitutional practices, but it also would lack the factfinding and record-developing capabilities of a federal district court.

*Id.,* at 497, 111 S.Ct. at 898; *see Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, ——, 114 S.Ct. 771, 779, 127 L.Ed.2d 29 (1994) (laying emphasis on *McNary*'s reliance on the fact that "the statutory language did not evidence an intent to preclude broad 'pattern and practice' challenges to the program" and that "if not allowed to pursue their claims in the District Court, respondents would not as a practical matter be able to obtain meaningful judicial review"). In contrast, no pattern and practice need be proved by Plaintiffs raising the equal protection claims in the Proposed Fourth Amended Complaint. The questions raised can be addressed in the context of reviewing any particular individual application involved here: reference to oth-

ers is unnecessary. Thus, there is no need for district court review.

Third, and relatedly, *McNary* suggested that a district court has jurisdiction where the standard of review involved in the administrative review process is inadequate to address the questions before the Court. *McNary* held the district court to have jurisdiction largely because no *de novo* review was available. Thus:

> the abuse-of-discretion standard of judicial review under § 210(e)(3)(B) would make no sense if we were to read the Reform Act as requiring constitutional and statutory challenges to INS procedures to be subject to its specialized review provision. Although the abuse-of-discretion standard is appropriate for judicial review of an administrative adjudication of the facts of an individual application for SAW status, such a standard does not apply to constitutional or statutory claims, which are reviewed de novo by the courts.

*Id.* at 493, 111 S.Ct. at 897; *see also Reno v. Catholic Social Servs.,* 509 U.S. 43, 56, 113 S.Ct. 2485, 2495, 125 L.Ed.2d 38 (1993) (holding similar language to mandate "district court jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application."); *Rahim,* 827 F.Supp. at 228; *Wang v. Reno,* 862 F.Supp. 801 (E.D.N.Y. 1994).

■ In contrast, the process set out for review of § 245 status adjustment applications provides for *de novo* review by an immigration judge, and the *McNary* considerations do not, therefore, apply. Indeed, our Court of Appeals recently indicated its approval of the recognition by the D.C. Circuit and the Seventh Circuit that "requiring an alien to utilize available administrative remedies will allow a full record to develop concerning the alien's application for adjustment of status." *Howell,* 72 F.3d at 293 (citing *Randall,* 854 F.2d at 482; *Massignani,* 438 F.2d at 1278).

The *McNary* Court suggested further that challenges to administrative mechanisms, as opposed to substantive determinations, mandate district court review. In *Rahim,* this Court held that it had jurisdiction where "the

essence of the complaints [was] a challenge to the I.N.S.'s regulations barring motions to reopen." *Id.* at 229. The Court, citing *McNary*, held that it had jurisdiction because, "plaintiffs do not seek 'a substantive declaration that they are entitled to SAW status.' Rather, if allowed to prevail in this action, respondents would only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures." *Id.* (quoting *McNary*, 498 U.S. at 495, 111 S.Ct. at 898). Here, the administrative mechanisms of the status adjustment process are not before the court; rather, Plaintiffs seek an injunction after the I.N.S.'s substantive application of the legislation. This is not the sort of question *McNary* contemplated.

In sum, the substantial constitutional claims that would be presented by the Proposed Fourth Amended Complaint contrast with the type of constitutional claim held to constitute an exception to the exhaustion rule. Because *Guitard* on the one hand and *McNary* and *Heckler* on the other suggest that departure from the doctrine of administrative exhaustion is not warranted, and because Plaintiffs' claims would be adequately addressed by review in the course of deportation proceedings, their claims are not justiciable. The Proposed Fourth Amended Complaint would, therefore, be subject to a successful motion to dismiss on jurisdictional grounds, and amendment would be futile. Hence, Plaintiffs' motion to amend will be denied.

### Conclusion

For the reasons set forth above, the Government's motion to dismiss for lack of jurisdiction is granted. As a consequence, Plaintiffs' motion for summary judgment is denied as moot. Plaintiff's motion to amend is denied.

It is so ordered.