**Kai Wu CHAN, Yong Sun Li, Fu Xin Li, Ren Ping Zheng, and Liang Wen Pan, Plaintiffs,**

v.

**Janet RENO, United States Attorney General, Defendant.**

**No. 95 Civ. 2586(RWS).**

United States District Court, S.D. New York.

Jan. 13, 1998.

---

See also, 1997 WL 122783.

Theodore N. Cox, New York City, for plaintiffs.

Mary Jo White, United States Attorney, Southern District of New York, New York City (F. James Loprest, Jr., Special Assistant U.S. Attorney, of Counsel), for defendant.

## OPINION

SWEET, District Judge.

The plaintiffs, nationals of the People's Republic of China who entered the United States without inspection or parole (the "Plaintiffs"), have moved pursuant to Rules 15(a) and 56 of the Federal Rules of Civil Procedure, for leave to amend their Complaint and for summary judgment. Defendant, the Attorney General of the United States (the "Government"), cross-moves for summary judgment. The Plaintiffs allege that (1) the Immigration and Naturalization Service (the "INS") regulation requiring applicants under the Chinese Student Protection Act of 1992 (the "CSPA") to have been inspected and admitted or paroled into the United States misinterprets the statute; (2)

the requirement, if correct, violates the Fifth Amendment guarantee of equal protection; and (3) the INS interpretation of new section 245(i) of the Immigration and Nationality Act of 1952, as amended (the "INA"), violates the Fifth Amendment guarantees of equal protection and due process. For the reasons set forth below, Plaintiffs' Amended Complaint is deemed filed, their motion for summary judgment is denied, and the Government's cross-motion for summary judgment is granted.

### The Parties

Plaintiffs are nationals of the People's Republic of China (the "PRC") residing in the United States. All entered the United states without inspection and admission or parole ("E.W.I. PRC nationals") on or before April 11, 1990.

Janet Reno is the Attorney General and head of the Department of Justice of the United States.

### Prior Proceedings

The background of this case is set forth in the prior opinions of the Court, familiarity with which is assumed. *See Chan v. Reno,* No. 95 Civ. 2586, 1997 WL 122783 (S.D.N.Y. 1997); *Chan v. Reno,* 916 F.Supp. 1289 (S.D.N.Y.), *reconsideration denied,* 932 F.Supp. 535 (S.D.N.Y.1996).

Plaintiffs filed the instant motion for summary judgment on May 13, 1997. The Government filed a cross-motion for summary judgment on July 21, 1997. Additional submissions were made and both motions were deemed fully submitted on September 2, 1997.

### Facts

#### I. *Executive Order 12,711*

On April 11, 1990, in response to the repression of dissidents in China following the Tiananmen Square uprising, President Bush issued Executive Order 12,711, granting broad protection against deportation for PRC nationals (the "Executive Order").[1] *See*

---

1. The relevant part of the Executive Order provides that:

 Section 1. The Attorney General is directed to take any steps necessary to defer until January 1,

1994, the enforced departure of all nationals of the People's Republic of China (PRC) and their dependents who were in the United States on or

Exec. Order No. 12,711, 55 Fed.Reg. 13897 (1990). The Executive Order deferred until January 1, 1994 "the enforced departure of all nationals of the Peoples Republic of China" who were in the United States between June 5, 1989 and April 11, 1990. *Id.* at § 1. The Executive Order did not draw any distinction between PRC nationals who had lawfully entered the United States and E.W.I. PRC nationals and thus provided protection to both groups. The Executive Order also granted to covered aliens documents to facilitate international travel, including reentry into the United States "in the same status" as when they departed, *id.* at § 2, maintenance of lawful status for purposes of status adjustment, *id.* at § 3(b), and authorization for employment through the expiration date of the deportation deferment, *id.* at § 3(c).

As of August 1992, approximately 80,000 PRC nationals in the United States applied for and received benefits under the Executive Order. *See* H.R.Rep. No. 102–826 (1992), pt. I. Of that number, approximately 70,000 had received work authorizations and 8,000 had become permanent resident aliens. *Id.*

## II. *INS Policy Regarding Advanced Parole*

On May 7, 1990, shortly after the Executive Order was issued, the INS promulgated a directive to its field offices interpreting several aspects of the Executive Order, and

after June 5, 1989, up to and including the date of this order (hereinafter "such PRC nationals").

Section 2. The Secretary of State and the Attorney General are directed to take all steps necessary with respect to such PRC nationals (a) to waive through January 1, 1994, the requirement of a valid passport and (b) to process and provide necessary documents, both within the United States and at U.S. consulates overseas, to facilitate travel across the borders of other nations and reentry into the United States in the same status such PRC nationals had upon departure.

Section 3. The Secretary of State and the Attorney General are directed to provide the following protections:

(a) irrevocable waiver of the 2–year home country residence requirement that may be exercised until January 1, 1994, for such PRC nationals;

(b) maintenance of lawful status for purposes of adjustment of status or change of nonimmi-

specifically addressing requests for advance parole ("Cable 1"). Cable 1 provided that "PRC nationals who need to travel outside of the United States may apply for advance parole. Upon approval of the request, the Service will ... permit the PRC national to reenter *in the same status he or she had upon departure.*" Cable 1, paragraph 8 (emphasis in original).

Cable 1 remained in force until August 16, 1993, when the INS issued a new directive which imposed more stringent requirements on eligibility for advanced parole ("Cable 5"). Cable 5 was promulgated a few weeks after the CSPA application period began on July 1, 1993.

## III. *The Chinese Student Protection Act of 1992*

The CSPA, signed into law in October, 1992 (over one year prior to the expiration of the protection offered by the Executive Order) granted further immigration relief, and provided that certain PRC nationals could apply for lawful permanent resident status. The CSPA governed applications "for adjustment of status under section 245" of the INA by PRC nationals who (1) were covered by the Executive Order. and (2) following the Order, (a) resided continuously in the United States but for "brief, casual, and innocent absences" and (b) were not physically present in the PRC for longer than 90 days.[2] *See* CSPA § 2(b).

grant status for such PRC nationals who were in lawful status at any time on or after June 5, 1989, up to and including the date of this order;

(c) authorization for employment of such PRC nationals through January 1, 1994; and

(d) notice of expiration of nonimmigrant status (if applicable) rather than the institution of deportation proceedings, and explanation of options available for such PRC nationals eligible for deferral of enforced departure whose nonimmigrant status has expired.

**2.** The relevant text of the CSPA reads:

Sec. 2. Adjustment to lawful permanent resident status of certain nationals of the People's Republic of China.

(a) In general. Subject to subsection (c)(1), whenever an alien described in subsection (b) applies for adjustment of status under section 245 of the Immigration and Nationality Act [this section] during the application period (as defined

Applications for status adjustment under the CSPA could be filed during a one-year period running from July 1, 1993 to June 30, 1994. The CSPA provided significant benefits to the covered aliens. Applicants were automatically granted immigrant status as skilled workers under INA sections 204(a) and 203(b)(3)(A)(I). *See* CSPA § 2(a)(1). An immigrant visa number did not need to be immediately available at the time the application was filed. *See* CSPA § 2(a)(2). Applicants for adjustment of status were exempt from section 245(c) of the INA, which excludes from adjustment eligibility aliens with, *inter alia*, unlawful immigration status on the date of filing the application or who had failed to maintain continuously a lawful status since entry into the United States. *See* CSPA § 2(a)(5); 8 U.S.C. § 1255(c). Furthermore, the Attorney General was granted permission to bypass national quotas.[3] CSPA § 2(a)(4).

The CSPA provided that the immigration law benefits would not accrue if the President certified to Congress, before the first date of the application period, that the covered aliens could safely return to the PRC. *See* CSPA at § 2(c)(1). No finding or certifi-

cation was made that any alien could safely return to the PRC, and accordingly the CSPA application period went into effect.

On July 1, 1993, the date the application period began, the INS promulgated a regulation interpreting the CSPA. *See* 8 C.F.R. § 245.9. This regulation required an applicant to establish "eligibility for adjustment of status under all provisions of section 245 of the [INA]." 8 C.F.R. § 245.9(a)(6). Therefore, according to the INS, only applicants who had been "inspected and admitted or paroled into the United States" would be eligible for CSPA benefits. *See* 8 U.S.C. § 1255(a). An alien covered by the Executive order who initially entered illegally—without inspection—would need to leave and return with inspection or advance parole to be eligible for CSPA benefits.

## IV. *New INA section 245(i) and the Regulation*

Section 245(i), which was added to the INA in 1994, provided a temporary three-year period within which aliens who were "physically present in the United States who . . .

---

in subsection (e)) the following rules shall apply with respect to such adjustment:

(1) The alien shall be deemed to have had a petition approved under section 204(a) of such Act for classification under section 203(b)(3)(A)(I) of such Act.

(2) The application shall be considered without regard to whether an immigrant visa number is immediately available at the time the application is filed.

(3) In determining the alien's admissibility as an immigrant, and the alien's eligibility for an immigrant visa—

(A) paragraphs (5) and (7)(A) of section 212(a) and section 212(e) of such Act shall not apply; and

(B) the Attorney General may waive any other provision of section 212(a) (other than paragraph (2)(C) and subparagraph (A), (B), (C), or (E) of paragraph (3)) of such Act with respect to such adjustment for humanitarian purposes, for purposes of assuring family unity, or if otherwise in the public interest.

(4) The numerical level of section 202(a)(2) of such Act shall not apply.

(5) Section 245(c) of such Act [subsection (c) of this section] shall not apply.

(b) Aliens covered.—For purposes of this section, an alien described in this subsection is an alien who—

(1) is a national of the People's Republic of China described in section 1 of Executive Order No. 12711 . . . as in effect on April 11, 1990;

(2) has resided continuously in the United States since April 11, 1990 (other than brief, casual, and innocent absences); and

(3) was not physically present in the People's Republic of China for longer than 90 days after such date and before the date of the enactment of this Act [Oct. 9, 1992].

(c) Condition; Dissemination of Information.—

(1) Not Applicable if Safe Return Permitted.— Subsection (a) shall not apply to any alien if the President has determined and certified to Congress before the first day of the application period, that conditions in the People's Republic of China permit aliens described in subsection (b)(1) to return to that foreign state in safety.

8 U.S.C. § 1255 note (1994) (alterations in original).

3. The adjustment of status application may not be approved, however, until a visa number becomes available for the applicant under the worldwide allocation of immigrant visa numbers for employment-based aliens under INA section 203(b)(3)(A)(I). *See* 8 C.F.R. 245.9(k).

entered the United States without inspection ... may apply ... for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence." *See* INA § 245(i), 8 U.S.C. 1255(i). Applicants were required to apply between October 1, 1994 and September 31, 1997. The one-year CSPA application period, which ended in June, 1994, therefore expired three months before the three-year section 245(i) application period began.

The INS issued regulation 8 C.F.R. § 245.10 in October, 1994, which stated that the provisions of section 245(i) "shall not apply to a motion to reopen or reconsider an application for adjustment of status if the application for adjustment of status was filed before October 1, 1994." Nevertheless, "an applicant whose pre-October 1, 1994, application for adjustment of status has been denied may file a new application for adjustment of status pursuant to section 245(i)" within the application period and paying the required fee.

The regulation thus prohibited an applicant who applied during the CSPA period from reopening or reconsidering the application with the additional benefits of section 245(i). They could, however, file a new application without the CSPA benefits. Thus, the CSPA applicants who were turned down for status adjustment because they had not entered with inspection or parole could not circumvent this defect by invoking the waiver provided by section 245(1).

## *Discussion*

### I. *Summary Judgment Standard*

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994) (a party is entitled to summary judgment if "resolving all ambiguities and drawing all factual inferences in favor of the non-moving party, there is no genuine issue of material fact to be tried"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *See Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

### II. *The Court Has Subject Matter Jurisdiction*

The Government's invitation to revisit the subject matter jurisdiction issues presented in this case, *Chan v. Reno*, No. 95 Civ. 2586, 1997 WL 122783 (S.D.N.Y.1997), is declined and that decision is the law of the case.

The Government cites no new law. Accordingly the Plaintiffs' interest in advancing the litigation outweighs the possible gain from relitigating already decided issues.

 Furthermore, the Government is not correct in its assertion that the "law of the case" doctrine applies only when a district court decision has been subject to appellate review. Rather, the doctrine " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citation omitted). In *Christianson*, the Supreme Court applied the doctrine in the context of a subject matter jurisdiction issue. As the Supreme Court noted, "[t]his rule of practice promotes the finality and efficiency of the judicial process." *Id.* Moreover, the doctrine applies to "a court's own decisions" and "merely expresses the practice of courts generally to refuse to reopen what has been decided." *Id.* 486 U.S. at 816–17 (citing *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.)). Therefore, although "a court has the power to revisit prior decision of its own ... in any circumstance, ... as a rule [it] should be loath to do so." *Id.* 486 U.S. at 817. *Cf. Asian Vegetable Research and Dev. Ctr. v. Institute of Int'l Educ.*, 944 F.Supp. 1169 (S.D.N.Y.1996) (refusing to revisit issue previously decided by the Court since the "parties fully briefed and argued this issue" and no new evidence was presented); *DiLaura v. Power Auth.*, 982 F.2d 73, 77 (2d Cir.1992) (in the context of one District Court judge reviewing the decision of a second District Court judge to whom the case was transferred, and no intervening appellate review of the first judge's decision, the court stated that "subject matter jurisdiction is particularly suited for reconsideration," and held that "cogent" and "compelling" reasons, including new relevant precedent, brought the issue within an exception to the law of the case doctrine).

**4.** The Court denied permission to amend the complaint to add an equal protection challenge

Therefore, consistent with the law of the case doctrine, the Court declines to reconsider at this time its earlier ruling regarding subject matter jurisdiction:

### III. *The Fourth Amended Complaint Is Deemed Filed and Amended*

 Although the Plaintiffs did not file an amended complaint subsequent to the Court's granting it leave to do so, the proposed Complaint is deemed filed for purposes of this summary judgment motion. The Court permitted Plaintiffs leave to amend the Complaint to add equal protection challenges to the INS's interpretation of the CSPA and INA § 245(i).[4] Plaintiffs have presented both issues in their briefs, and the Government has responded. Accordingly, the Fourth Amended Complaint is deemed filed consistently with the Court's opinion.

The Court also deems the Complaint amended to include Plaintiffs' claim that the INS regulation interpreting INA section 245(i) violates the due process clause. Plaintiffs filed a motion on January 28, 1997, to clarify that their Fourth Amended Complaint alleged that 8 C.F.R. § 245.10 was unconstitutional on both equal protection and due process grounds. At that time, the Plaintiffs' motion to vacate judgment and to amend the complaint was *sub judice*. The Government requested by letter dated February 14, 1997 that the motion be held until the Court adjudicated the pending motion. *See* Letter from F. James Loprest, Jr., May 30, 1997. In their letter request, the Government conceded that the motion did not present a new claim, but rather sought to clarify an existing claim. *Id.* at 3 ("Perhaps the best reason to postpone consideration of plaintiffs' new motion ... is that the only new claim it presents ... [is] an argument plaintiffs presented in support of their [currently pending motion to vacate]" and the "Government responded to plaintiffs' attack" in the pending motion). On May 15, 1997, the Court ordered the motion off the calendar with leave to renew upon letter motion.

to the INS Cable 5.

The Plaintiffs renewed the motion to amend the Complaint to add a due process claim by letter dated May 23, 1997. The return date was set for June 18, 1997, also the return date of the summary judgment motion. The Government did not file opposing papers. Without any further order of court, however, both the Government and Plaintiffs argued the due process claim in their summary judgment motions. Accordingly, the Court deems the Fourth Amended Complaint to include the claim that the regulation violates the due process clause.

## IV. *INS Interpretation of Chinese Student Protection Act in Reasonable*

■ The Plaintiffs attack the INS regulation interpreting the CSPA to require entry into the United States either by inspection and admission or parole on both statutory interpretation and equal protection grounds. As a matter of statutory interpretation, Plaintiffs contend that the INS interpretation fails to account for Congress' intent to benefit all PRC nationals protected by the Executive Order, and not merely those who entered the United States lawfully.

To understand the statute's meaning requires examination of its text. The CSPA required applicants to seek a status adjustment " 'under section 245'." CSPA § 2(a). Section 245 is the general provision for status adjustment under the INA. Subparagraph (a) of that section states that the "status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General." 8 U.S.C. § 1255(a).[5] For the Court to accept the Plaintiffs' position that Congress did not intend to apply this requirement, we must conclude that CSPA applicants may adjust their status "under section 245" but read out of section 245 the portion of subparagraph (a) requiring inspection or parole.

The CSPA, however, includes an express exemption of the limitations imposed by sub-

paragraph (c) of section 245. Accordingly, Congress' decision to exclude one subparagraph of section 245 is evidence that other provisions not excluded are intended to remain. *See Pan v. Reno*, 879 F.Supp. 18, 20 (S.D.N.Y.1995) (since CSPA expressly "states that covered PRC nationals can apply for a status adjustment despite the limitations imposed by § 245(c), the [CSPA] should be read as leaving in place § 245(a)'s requirement that applicants for a status adjustment have been inspected and either admitted or paroled"); *Tang v. Reno*, 77 F.3d 1194 (9th Cir.1996) (same); *Qi–Zhuo v. Meissner*, 70 F.3d 136 (D.C.Cir.1995) ("[T]ext and structure of CSPA makes clear that the Act does not exempt covered PRC national from the INA's threshold inspection requirement.").

Plaintiffs contend that the legislative history of the CSPA makes clear that the purpose of the CSPA is to address the legal limbo of all of the temporarily protected Executive Order beneficiaries so that they can plan for the future and make long-term plans for their families. Although not cited by Plaintiffs, this statement appears to be drawn from the following passage in the House Report:

Unless Congress acts to regularize the status of PRC nationals now temporarily protected under the DED program, the President will at some point either extend the DED program for an additional period of time, or the President will allow the program to lapse, placing most if not all of the current beneficiaries in illegal status. Each of the above options presents serious risks. If the program is again extended, *program beneficiaries will continue to live here in a limbo status, unable to make long term plans regarding education, employment, or the welfare of their families.* Assimilation will be impeded. Alternatively, if the program is not extended, the Immigration and Naturalization Service

---

**5.** The section provides that:

The status of an alien *who was inspected and admitted or paroled into the United States* may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the

alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a) (emphasis added).

will be faced with additional and severe enforcement problems in locating and deporting this large population of persons from the United States.

H.R.Rep. No. 102–826 (1992), pt. II, U.S.Code Cong. & Admin.News 1992, pp. 1355, 1357 (emphasis added).

Placing Plaintiffs' assertion in this context, however, leads to the opposite conclusion. The House Report is concerned with "placing ... current beneficiaries in illegal status" and the burden on the INS of "locating and deporting" them. *Id.* The motivation to avoid an additional burden, however, is not applicable to those beneficiaries who are *already* in illegal status, such as the Plaintiffs here. Rather, it is directed at those PRC nationals with legal status who would be "placed in illegal status" without the relief provided by the CSPA.

Other courts that have examined the legislative history have concluded that it is ambiguous, at best, and therefore is insufficient to overcome the textual analysis concluding that the inspection or parole requirement is applicable. *See Pan* at 20 ("The most that can honestly be said is that the CSPA, as enacted, may have been interpreted differently by different legislators."); *Qi–Zhuo,* 70 F.3d at 140 ("The legislative history seems, at best, inconclusive on the application of 245(a) to covered aliens, and in the realm of legislative interpretation, inconsistent history certainly cannot override plain language.").

The CSPA further provided that the application period would not begin if the President certified to Congress, before the first date of the application period, that the covered aliens could safely return to the PRC. CSPA at § 2(c). Plaintiffs contend that it is reasonable to assume that protection afforded immediately following the Tiananmen Square incident to PRC nationals who had entered the United States illegally would not be snatched away in the absence of the President's certification of safe return. On the other hand, it is just as reasonable that Congress' concern was for lawful entrants who would otherwise be deported when the Executive Order expired.

The INS, as the agency responsible for administering the INA, is entitled to defer-

ence if its interpretation is reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In light of the textual analysis pointing towards Congress' intent to exclude only selected portions of section 245, and in the absence of any compelling contrary showing of congressional intent, the failure to exclude the section 245(a) requirement for inspection and admission or parole cannot be said to constitute an oversight rather than a legislative decision.

### V. *INS Interpretation Of Chinese Student Protection Act Does Not Violate Equal Protection Guarantee*

■ The Plaintiffs are guaranteed equal protection of the laws. The Fourteenth Amendment guarantee that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws" is applicable to the federal government. *See Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (Fifth Amendment due process subsumes equal protection guarantee). As early as 1886, the Supreme Court recognized that "the constitutional promise of equal protection of the laws applies to aliens as well as citizens." *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (applying protection to legal aliens). Furthermore, aliens who are in the United States unlawfully are within the sweep of the equal protection clause. *See Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (rejecting argument that undocumented aliens, because of their immigration status, are not "persons" within the meaning of the equal protection clause).

■ For a federal regulation affecting aliens to fail equal protection scrutiny, Plaintiffs must show that the regulation distinguishes between two otherwise similarly situated classes of individuals, and that the distinction between the classes is not rationally related to a legitimate government purpose. *See Francis v. INS,* 532 F.2d 268 (2d Cir.1976) ("[D]istinctions between different classes of persons 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial

relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' ") (quoting *Stanton v. Stanton,* 421 U.S. 7, 14, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975)); *Azizi v. Thornburgh,* 908 F.2d 1130, 1133 (2d Cir.1990) (government need only point to some "legitimate reason for adoption of the classification").

For example, in *Giusto v. I.N.S.,* 9 F.3d 8 (2d Cir.1993), the Second Circuit held that a statutory distinction denying discretionary relief from deportation for aliens who have served at least five years in prison did not violate equal protection. The Court stated that "Congress's establishment of such classifications will be upheld against an equal protection challenge if there is a ' " "facially legitimate and bonafide reason' " for the classification.' " *Id.* at 9–10 (quoting *Fiallo v. Bell,* 430 U.S. 787, 794, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Kleindienst v. Mandel,* 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972))). The Court found that, "although the legislative history was 'scant,' the five-year cut-off was to broaden the list of serious crimes, the conviction of which results in various disabilities and preclusion of benefits under the Immigration and Nationality Act." *Id.* at 10. Accordingly, the Court held that the purpose of the distinction drawn was "facially legitimate" and had a "rational basis." *Id.*

■ Plaintiffs contend that the combined effect of the Executive Order, the INS regulation and INS policy created two classes of individuals who were otherwise similarly situated without any rational basis. First, the Executive Order protected from deportation for a specified period certain E.W.I. PRC nationals. Second, this group was subdivided into those who, pursuant to Cable 1, applied for and automatically received advance parole to reenter the United States, and those who did not. Since the grant was automatic, the classes were similarly situated. Finally, Plaintiffs allege that the Executive Order beneficiaries who obtained advanced parole pursuant to Cable 1 were granted CSPA benefits, whereas those who did not were denied the benefits. In short, by freely granting parole and thereby enabling certain E.W.I. PRC nationals to attain a status that was necessary to gain CSPA benefits, the INS opened the door to all those who could have applied but did not.

Plaintiffs contend that the automatic granting of advance parole transformed it into a mere "travel" requirement, thereby rendering the two classes similarly situated without a rational distinction, bringing the case within the control of *Francis.* In *Francis,* the BIA had issued a final order of deportation against the plaintiff on the grounds that he had been convicted of a marijuana offense, and the Board of Immigration Appeals (the "BIA") held that the plaintiff was not eligible for a discretionary review of the order by the Attorney General because he had not departed from the United States and returned to an unrelinquished domicile. *Francis,* 532 F.2d at 269. However, BIA precedent permitted aliens convicted of marijuana offenses who had departed and returned to obtain discretionary review by the Attorney General. The Court of Appeals held that the "travel requirement" imposed by the BIA's interpretation of the INA section providing for discretionary review by the Attorney General bore no rational relationship to the section's purpose of allowing flexibility to permit "worthy ... aliens to continue their relationships with family members in the United States despite" the existence of a technical basis for deportation. *Id.* at 272–73. The Court noted the lack of "any reason why this petitioner's failure to travel abroad following his conviction should be a crucial factor in determining whether he may be permitted to remain in this country." *Id.* at 273. The Court thus held the agency interpretation of the statute to be unconstitutional because it was "irrational to distinguish between two categories of narcotics offenders on the basis of a brief visit out of the country." *Tok v. I.N.S.,* 538 F.2d 36, 38–39 (2d Cir.1976) (construing *Francis* ).

Plaintiffs' argument fails, however, because they have not shown that the Executive Order beneficiaries who were granted advance parole under cable 1 were similarly situated with those who did not apply.[6] Central to

6. The Government advances an additional argument, not previously considered by the Court,

Plaintiffs' contention is the claim that Cable 1 assured advance parole to *all* E.W.I. PRC nationals and therefore those who did receive advance parole were similarly situated with the Plaintiffs who never applied.

Whereas the Court granted Plaintiffs leave to amend the Complaint to add this equal protection claim, in that decision the Court was constrained to assess this claim on the basis of a motion to dismiss. *See Chan v. Reno,* No. 95 Civ. 2586, 1997 WL 122783, *8 (S.D.N.Y.1997) ("An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis.") (citing *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Building 1 Housing Dev. Fund Co., Inc.,* 608 F.2d 28, 42 (2d Cir.1979) and *Freeman v. Marine Midland Bank–New York,* 494 F.2d 1334, 1338 (2d Cir.1974)). The Court therefore assumed all the facts alleged by Plaintiffs were true. *Id.* at *16 ("[A]ssuming the allegations in the proposed Fourth Amended Complaint are true, Plaintiffs have made out a claim that their equal protection rights may have been violated"). For purposes of the instant summary judgment motion, however, Plaintiffs must show a genuine issue of material fact to defeat the Government's motion. *See* Fed. R.Civ.P. 56(c). Under that standard, Plaintiffs' argument fails.

The Government contends that, even under the Executive Order and Cable 1, granting advance parole remained discretionary and was not automatic. For example, the Government contends that Senior INS offi-

cials interpreted Cable 1 to be decided on a case-by-case basis, and specifically would be denied if the destination was China. *See* Interpreter Releases, May 14, 1990 (Federal Publications Inc.) ("[W]hile advance parole requests by PRC nationals are to be considered on a case-by-case basis, normal standards do not apply" and "any denied advance parole requests are to be sent to the INS' Central Office for review."). Defendants provide as evidence that parole was not automatically granted the facts relating to plaintiff Jing Kui You. You filed on December, 18, 1991 an application for advance parole to travel to the PRC. The application was denied by the INS on January 9, 1992, which was during the period when Cable 1 was applicable. Therefore, even among the Plaintiffs here, parole was not automatic under Cable 1.

Plaintiffs provide no evidence to refute the Government's contention. Instead, they contend that "[d]iscovery would show that, in practice, trips to China were uniformly approved." They further contend that such discovery is not necessary because the Government has failed to prove that approval is not automatic. This, however, misapplies the applicable standard. The Government has presented evidence that applications for advanced parole under Cable 1 were not automatically granted. Plaintiffs' mere conclusory statement is insufficient to create a genuine issue of material fact that parole was granted automatically.

that advance parole granted pursuant to the Executive Order is insufficient for status adjustment purposes. According to the Government, this conclusion is compelled by the Executive Order's text which provides that PRC nationals reentering the United States after international travel do so "in the same status [they] had when they had upon departure." Executive Order, § 2. *Cf. Yeung v. Reno,* 868 F.Supp. 53, 58 (S.D.N.Y. 1994), aff'd. mem., 57 F.3d 1062 (2d Cir.1995) (validating INS's denial of adjustment to alien who reentered the United States under a grant of advance parole, since "Congress could have intended that those aliens who initially entered the United States illegally be barred from the protections of the CSPA, despite later legal conduct"). The "same status" provision deprives the beneficiaries of the status enhancement normally gained by advance parole. Therefore, even if the

Plaintiffs are similarly situated as the class of E.W.I. Chinese who gained advanced parole under the Executive Order, both groups should be denied CSPA benefits. The Government contends that, even if some CSPA applications were approved on this basis, it was an error, and, in essence, two wrongs do not make a right.

Plaintiffs seek to refute this interpretation by showing that many E.W.I. Chinese who gained parole status only pursuant to the Executive Order were granted CSPA benefits. They contend that the INS Vermont Service Center denied only 5% of the CSPA applications received, and speculate that many of the 95% approved applications must have gained advance parole status pursuant to the Executive Order. Notwithstanding this unsupported speculation, this issue need not be resolved in view of the failure of proof of substantial similarity.

If Plaintiffs were to be correct, then all E.W.I. PRC nationals who applied for advance parole could have traveled and reentered the United States, regardless of any other factor such as when they entered the United States or their destination. Accordingly, anyone covered by the Executive Order could have applied for CSPA benefits, had they chosen to do so. However, Plaintiffs have failed to show that the INS granted parole automatically to any E.W.I. PRC national who applied, and no further proof has been offered to show which, if any, of the Plaintiffs or others are similarly situated as those E.W.I. PRC nationals who did obtain advance parole. Since the existence of two differently treated classes who are otherwise similarly situated is a material element of Plaintiffs' equal protection claim, summary judgment must be granted for the Government.

## VI. INS' Denial of INA Section 245(i) benefits in Reopened Cases Does Not Deny Equal Protection of the Laws

Section 245(i) of the INA, 8 U.S.C. 1255(i), provides that an alien may receive discretionary status adjustment without satisfying the requirements of inspection and admission or parole if the alien pays a five-fold "superfee." Finding their CSPA applications denied for failure to comply with the requirements that are waived by section 245(i), Plaintiffs attempt here to concatenate the benefits of the CSPA with the benefits of section 245(i) by reopening their CSPA applications. However, this attempt is frustrated by the INS's interpretation of INA section 245(i) to apply only to applications filed on or after October 1, 1994, and therefore not to apply to reopened CSPA applications. *See* 8 C.F.R. § 245.10.

Plaintiffs seek to attack the INS interpretation on equal protection and due process grounds. The Plaintiffs, equal protection claim contends that this interpretation prevents only CSPA applicants from taking advantage of the waiver of the inspection or parole requirements, thereby disadvantaging CSPA applicants relative to other aliens applying for such adjustment.

The premise, however, that the interpretation excludes CSPA applicants from section 245(i) benefits, however, is based on a misreading of the regulation. Under the regulation, a previous CSPA applicant denied status adjustment can file a new application under section 245(i) and be considered for status adjustment notwithstanding unlawful entry. *See* 8 C.F.R. § 245.10 ("[A]n applicant whose pre-October 1, 1994, application for adjustment of status has been denied may file a new application for adjustment of status pursuant to section 245(i)."). Plaintiffs do not dispute this, and rather complain that the Government's interpretation denies the Plaintiffs the benefits of both statutes in the same application.

Given the availability of the statute to Plaintiffs, albeit without the CSPA benefits, Plaintiffs' contention that the INS interpretation cannot be valid since it violates equal protection is without merit. Requiring CSPA applicants, along with all other prior applicants, to file a new application rather than reopen their previous application is rationally related to the statute's purposes. As the Government contends, the INS interpretation grants status adjustment relief to aliens who otherwise would not qualify, but in a way that enforces "repose with respect to the possibly thousands of adjustment applications filed before section 245(i)'s effective date." Furthermore, since the CSPA applicants may submit a new application, the interpretation generates additional revenues, since the previously-rejected CSPA applicants would pay the "superfee." Accordingly, these two statutory purposes advanced by the Government, and not refuted by the Plaintiffs, are rationally related to the INS regulation prohibiting the concatenation of CSPA and INA section 245(i) benefits.

## VII. INS' Denial of INA Section 245(i) benefits in Reopened Cases Does Not Violate Due Process

Plaintiffs further contend that denial of section 245(i) benefits to reopened applications violates (1) procedural due process; and (2) a due process principle that a case should be decided on the basis of present law, if a

change in law occurs during the pendency of the case.

 The Fifth Amendment prohibits the Government from depriving an individual of "life, liberty, or property, without due process of law." U.S. Const. amend V. To invoke the procedural protections of the Constitution, a litigant must identify the interest being deprived. *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Here, Plaintiffs fail to state any deprivation.[7] However, whether the claimed interest is characterized as a property or liberty interest, the argument fails of its own circularity. Since as already section 245(i) does not apply to reopened CSPA applications for status adjustment, there can be no deprivation of a property or liberty interest thereby created. *See Azizi*, 908 F.2d at 1134 (holding no deprivation of property interest since plaintiff was not in class benefited by statute). Because Plaintiffs fail to identify a protected interest, their procedural due process claim is dismissed.

Plaintiffs' second proposition must also fail. The question is not, as the Plaintiffs contend, *whether* new law should be applied to pending cases. Here, the new law, by its own terms, applies only to status adjustment applications filed during the three-year period. This excludes applicability to applications filed before the three-year window and merely reopened within the window.

The cases cited by the Plaintiffs are off-point. *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78, 63 S.Ct. 465, 87 L.Ed. 621 (1943) considers the question of whether a new statute should apply to pending applications. *See also Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) ("[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."). Likewise, Plaintiffs' reliance on *DeGurules v. I.N.S.*, 833 F.2d 861 (9th Cir.1987) is not relevant to their claim. In that case the issue was not whether the new statute would be

applicable to the pending case, but rather whether the new statute could be applied retroactively without resulting in a manifest injustice. *Id.* at 863.

### Conclusion

For the reasons set forth above, the Plaintiffs' Amended Complaint is deemed filed, their motion for summary judgment is denied, and the Government's cross-motion for summary judgment is granted.

Settle judgment on notice.

It is so ordered.

---

7. The Plaintiffs jump immediately to analyzing the issue under a *Mathews v. Eldridge* balancing test. *See Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Since there is no deprivation here, the *Mathews* test is not reached.